Filed 12/5/22  P. v. Delgado CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAIME DELGADO,<br><br>    Defendant and Appellant. | B314239<br><br>(Los Angeles County<br>Super. Ct. No. VA009835) |

APPEAL from an order of the Superior Court of Los Angeles County, Olivia Rosales, Judge.  Affirmed.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Susan Sullivan Pithey, Assistant Attorneys General, Daniel C. Chang and Charles S. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

In 1992 a jury convicted Jaime Delgado of the first degree murder of Mark Meraz and two counts of assault with a firearm on Richard Meraz[1] and Joe Lopez. The jury also found true as to each count that Delgado personally used a firearm in the commission of the offense (Pen. Code § 12022.5, subd. (a))[2] and the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(2)). Delgado appealed, and we affirmed. (*People v. Delgado* (Sep. 21, 1994, B073625) [nonpub. opn.] (*Delgado I*).)

In 2019 Delgado, representing himself, filed a petition for resentencing seeking to vacate his murder conviction and be resentenced pursuant to former section 1170.95 (now section 1172.6).[3] The trial court appointed counsel to represent Delgado, and in 2021 it held an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3), at which the court heard live testimony and considered the transcripts from the jury trial. At the hearing a witness who had identified Delgado at trial as the driver of the Jeep that transported the two shooters to the Meraz family house just before the murder changed his testimony, saying he had lied at trial. The court found the witness not credible and denied Delgado's petition, finding beyond a reasonable doubt that Delgado was a direct aider and abettor in a planned attack on the Meraz family "with the intent to kill."

---

[1]   We refer to the Meraz family members by their first names to avoid confusion.

[2]   Further statutory references are to the Penal Code.

[3]   Effective June 30, 2022, section 1170.95 was renumbered as section 1172.6 with no change in the text. (Stats. 2022, ch. 58, § 10.)

Delgado's sole contention on appeal is that the superior court never found he personally harbored an intent to kill, and therefore the superior court should have resentenced him to second degree murder. However, Delgado never argued in the superior court that he should have been resentenced for second degree murder (instead arguing he was innocent). Further, section 1172.6 does not provide relief for a defendant who is still guilty of murder under amendments to sections 188 and 189 but should have been convicted of a lesser degree of murder. Moreover, substantial evidence supports the court's finding Delgado had an intent to kill. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Evidence at Trial*

At about 1:00 p.m. on October 2, 1991, a black Jeep with five to six occupants drove by the Meraz house in Artesia, California, where Richard lived with his mother (Bertha), his father, and his two brothers, Mark and Gilbert. Richard testified he had contact with Delgado before that day, and Delgado was the driver. The Jeep had an open top with a roll bar. Richard and his mother were in the living room of the house facing the street when the Jeep stopped in front of the house. As the Jeep passed by, Richard heard one of the occupants ask, "'Is this the house?'" One of the occupants stood up in the back of the Jeep and grabbed the roll bar.

At about 9:00 that night Richard, Mark, and Richard's friends Joe Lopez and Anthony Mitchell were standing on the lawn in front of the Meraz home when the same Jeep drove by the house. Richard, Mark, and the two friends were standing behind Bertha's car, which was parked on the front lawn.

3

Richard did not recognize the driver that night, but Lopez identified Delgado as the driver. Lopez had previously seen Delgado's brother Benjamin drive the Jeep.

The Jeep drove about three houses past the Meraz house, then backed up and turned into the alley. After it pulled into the alley, two men jumped out and walked toward the street. Lopez observed the men were "'coming straight for us,'" and Richard told his friends to go inside the house. Mark and Mitchell went into the house; Lopez went around the side of the house to awaken Richard's father.

Richard observed the two men stop in front of a house across from the Meraz house. The men pointed their guns toward the Meraz house and fired approximately 30 rounds. Other rounds were fired from the alley toward the Meraz house. Lopez testified that when he heard the gunfire, he ran outside and saw a man in the center of the street firing a handgun. The two men started to run toward the alley, and Richard fired eight rounds from his semi-automatic gun while standing behind Bertha's car. One of the gunmen fell to his knees, then limped away with the other shooter toward the alley where the Jeep had driven. The two men then turned into the alley.

Bertha heard the gunshots, and she and her husband ran toward the living room, where she found Mark on the floor. She looked out the window and saw at least eight flashes from a gun. Mark later died of a gunshot wound to the chest.

On the night of the shooting, Los Angeles County Sheriff's Department firearms expert J.W. Whitmarsh recovered 12 expended cartridge casings from both sides of a fence in the alley. He opined the casings were from one .30 caliber firearm. Whitmarsh recovered 13 expended cartridge casings from the

4

front yard of the house across the street from the Meraz house and the sidewalk in front of and around the house, at least nine of which he opined were from a single 9 millimeter firearm. Whitmarsh also recovered 12 expended cartridge casings from the driveway of another house across the street from the Miraz house, which he opined were fired from a second 9 millimeter gun. Whitmarsh also recovered bullets and bullet fragments from areas in and around the Meraz house. Four of the bullets and bullet fragments were 9 millimeter caliber, the same caliber as the bullet recovered from Mark's body. Whitmarsh opined the four bullets could all have been fired from the same 9 millimeter gun.

Later that night or early the next morning Lopez identified a Jeep that was found by the police as the one Delgado was driving. A fingerprint lifted from the driver's side rear view mirror matched one from Delgado's left thumb. Other prints in the car matched those of codefendant Sergio Martinez and Jose Alvarado. Codefendant Isabel Rios was seen that night at a local hospital with a gunshot wound to his left shoulder. Richard subsequently identified Rios as one of the shooters.

On October 7 Richard identified the driver of the Jeep on the afternoon of the shooting as Delgado, who went by the gang moniker "Apache." The same day Lopez identified Delgado from a six-pack photographic lineup as the driver of the Jeep the night of the shooting. Lopez later identified one of the shooters as Martinez.

Delgado's girlfriend, Veronica Renteria,[4] testified for the defense. Veronica lived with her parents and her sister. On the night of the shooting Veronica went to counseling and returned to her home around 9:30 p.m. Delgado was there when she returned, along with her family. When she arrived home, there were a lot of police officers on the street and a helicopter in the air. She stayed in her home with Delgado until about 11:30 that night. On cross-examination Veronica acknowledged she, Delgado, and her family went outside and watched the police activity. She saw the police tow Delgado's car away, but Delgado did not say anything to the police. Veronica admitted she had seen Delgado previously drive the Jeep. Veronica's sister Elizabeth similarly testified that on the night of the shooting Delgado was at the family's home, arriving sometime between 7:30 and 8:00 p.m. According to Elizabeth, Delgado came to see Veronica and planned to wait for her. Veronica came home around 10:00 p.m.

The jury convicted Delgado of the first degree murder of Mark and two counts of assault with a firearm on Richard and Lopez. The trial court sentenced Delgado to an aggregate term of 25 years to life plus five years in state prison. Delgado appealed, and we affirmed. (*Delgado I, supra*, B073625.)

B. *Delgado's Petition for Resentencing and the Trial Court's Ruling*

On March 12, 2019 Delgado, representing himself, filed a form petition for resentencing seeking to vacate his murder

---

[4] We refer to the Renteria sisters by their first names to avoid confusion.

6

conviction and be resentenced in accordance with recent statutory changes relating to accomplice liability for murder.  In his petition, Delgado declared he was convicted of murder under the felony-murder rule or the natural and probable consequences doctrine and could not now be convicted of murder because of changes made to sections 188 and 189.  He also stated he was convicted of felony murder, he was not the actual killer, he did not intend to kill, and he was not a major participant in the felony and did not act with reckless indifference to human life during the course of the offense.  Delgado requested the court appoint him counsel.

Delgado attached to his petition a 2012 declaration from Richard, in which Richard stated he was a friend of Delgado's from school, being in jail, and "the [s]treets."  Richard averred his testimony at trial that Delgado drove the Jeep that stopped in front of Richard's house on the afternoon of the shooting was false.  Delgado was not in the Jeep, but Richard claimed he was because he blamed Delgado for failing to convince the Chivas gang members[5] not to shoot at the Meraz house.  Richard added that Lopez threatened him after the shooting, stating that he would harm Richard if he challenged Lopez's identification of Delgado as the driver.

The superior court appointed counsel to represent Delgado.  The People opposed the petition on the basis the facts set forth in our opinion in *Delgado I* showed Delgado was a direct aider and abettor who acted with the intent to assist his fellow gang

---

[5] The Meraz house was in the territory of the Artesia gang; Chivas was a clique of the gang.  Mark was a member of the Hawaiian Gardens gang, which was the archrival of the Chivas gang.  Delgado and Rios were members of the Chivas gang.

7

members in killing Mark. In addition, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015), which added former section 1170.95, was unconstitutional.

Delgado's attorney filed a reply brief in which he argued Delgado made a prima facie showing of eligibility in that the jury was instructed on felony murder and the natural and probable consequences doctrine, and it may have convicted him of murder based on one of those theories. The reply also relied on Richard's 2012 declaration in which he stated Delgado was not the driver of the Jeep. In addition, the reply attached a 2015 declaration from Rios, who stated he committed the murder of Mark; Delgado had no knowledge of the murder; and Delgado "was not at all present or a part of the murder of Mark Meraz." The reply also attached a transcript from Rios's May 22, 2018 parole hearing, in which Rios stated he fired at the Meraz house along with Martinez and Herman Nigel.

On October 23, 2020 the superior court found Delgado made a prima facie showing of eligibility for relief under former section 1170.95 and set the matter for an evidentiary hearing. At a December 21, 2020 hearing the prosecutor requested defense counsel be barred from calling witnesses to testify Delgado was not the person driving the Jeep and was not involved in the shooting. The prosecutor argued a defendant may present additional evidence to show he was not convicted of murder under a theory that is still valid under amendments to sections 188 and 189, not whether the defendant was wrongfully convicted. Delgado's attorney responded that once Delgado made a prima facie showing, he could present evidence on identity to show Delgado was not the person who was involved in the murder notwithstanding the jury's true finding that Delgado

8

personally used a firearm in the commission of the murder and assaults. The court held Delgado could present evidence of identity, explaining, "I believe that based on what [the] People's burden of proof is and that new evidence is allowed to see whether the conviction is still valid, that evidence in this case . . . as to identification is permissible, and the court will allow it."

The court held an evidentiary hearing on January 29, 2021. Richard testified that when he identified Delgado from a six-pack photographic lineup, he was identifying him as "just being the owner of the [Jeep]." Richard repeated his testimony that on the night of the shooting a Jeep came toward his house, stopped, backed up, then turned into the alley and stopped again. Two men jumped out of the Jeep and walked toward the Meraz house, on the opposite side of the street. One of the men pulled out a 9 millimeter handgun. Richard stated that when the Jeep first arrived that night it stopped two houses from the Meraz house, directly under a street light. When asked whether he saw Delgado in the vehicle, Richard responded, "Not exactly. I seen the person that resembled him . . . ." He added that the person who resembled Delgado was sitting in the driver's seat. Richard denied he ever told the police that Delgado was in the Jeep the night of the shooting. At the hearing he initially denied that Lopez had ever threatened him, but after reviewing his prior declaration, Richard acknowledged he had signed the declaration and the statement was true.

On cross-examination, after reviewing the transcript of his testimony at trial, Richard admitted he had testified Delgado was driving the Jeep on the afternoon of the shooting. When asked whether he was "100 percent sure" the Jeep he saw in the

9

afternoon was Delgado's vehicle, he responded, "Yes, sir." He acknowledged he had written in his declaration that he had lied when he identified Delgado as the driver of the Jeep in the afternoon. Richard also admitted that when he saw the same black Jeep that night, he was "100 percent confident that it was [Delgado's] black Jeep."

Elizabeth testified, as she did at trial, that Delgado was at her home at the time of the murder. Delgado had been there for "a couple hours before." At the time Elizabeth testified at trial, Delgado was dating Veronica.

Rios admitted he participated in Mark's murder but stated Delgado did not drive him to the Meraz house and was not involved in the murder. Rios acknowledged he stated at his parole hearing that Delgado was present at the time of the murder, but this was a lie. Rios also admitted he lied at trial when he testified in his own defense that he was not present at the time of the murder, he was not injured as a result of the murder, and he was not in a gang.

Dr. Iris Blandon-Gitlin provided expert testimony on the factors that affect a person's memory and eyewitness testimony.

The prosecutor argued Delgado's Jeep was identified as the vehicle used in the crime; Delgado was identified as driving his Jeep by the Meraz house the afternoon of the murder; and he was also identified as driving the Jeep at the time of the shooting. He urged the court not to give any weight to Rios's testimony because he was convicted, then paroled, so he could not suffer any harm from his testimony and had an incentive to help Delgado. In addition, he lied at trial and before the parole board. The prosecutor also pointed to the trial testimony in which Veronica stated she and Delgado went outside her home and watched

Delgado's Jeep be towed away from the scene but did not do anything in response. He asserted an innocent person would have told the police not to tow his car.

Delgado's attorney argued the only physical evidence showing Delgado was involved in the murder was his fingerprint in the Jeep. In addition, Elizabeth was an alibi witness and repeated her testimony at the hearing even though Delgado was no longer dating her sister. Further, Richard was not able at trial or the hearing to identify Delgado as the driver of the Jeep on the night of the shooting. The only identification of the driver in the evening was by Lopez, who was not close to the Jeep. And there was post-shooting information that could have influenced Lopez's testimony. Therefore, there was insufficient evidence to prove beyond a reasonable doubt Delgado was the driver of the Jeep on the night of the murder.

The superior court noted it had considered the trial testimony, the testimony from the evidentiary hearing, and Rios's statement to the parole board. It observed Richard had been consistent in saying Delgado was the driver of the Jeep in the afternoon and describing how the shooting occurred that night. Further, Richard's testimony at the hearing was not different from his earlier testimony. The court explained, "It's clear this was a planned attack on a rival gang. It was cased before. Mr. Meraz saw Jaime Delgado drive that car. And Mr. Meraz . . . you know, could have easily said, 'I saw Jaime driving it at night.' He was very honest."

The court found Elizabeth's testimony not credible that Delgado sat at Veronica's home for hours even though Veronica was not there, and he did nothing in response to his Jeep being towed away. As to Rios, the court explained he was "a murderer"

11

and he lied to the police and his family and friends about his involvement, and to the parole board. It was only after he was paroled when he had nothing to lose that he provided exonerating evidence. The court "discredit[ed] anything Mr. Rios has to say." The court observed the expert provided helpful testimony about people's memory, but she could not state whether Lopez was providing an accurate identification. The court added, "I have not heard anything that casts Mr. Lopez's testimony and I.D. of Mr. Delgado in any doubt more so than was already in place at the time of trial."

The superior court concluded, "So for those reasons, I find that relief is not to be granted and I will not grant relief. I find beyond a reasonable doubt that [Delgado] was a direct perpetrator, and aider and abettor in a planned attack with multiple weapons against the Meraz family and Meraz house resulting in death in that they went out there to commit with the intent to kill. You don't case the place, plan it even earlier on, and then come back with multiple weapons if not to . . . shoot up a house knowing that people are outside . . . . It wasn't just to shoot up a house. It was to shoot people inside and outside the house so they did so with the intent to kill. So for those reasons the petition is denied."

Delgado timely appealed.

## DISCUSSION

A.     *Senate Bill No. 1437 and Section 1172.6 (Former Section 1170.95)*

Senate Bill No. 1437 eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of

12

murder and significantly limited the scope of the felony-murder rule. (*People v. Lewis* (2021) 11 Cal.5th 952, 957; *People v. Gentile* (2020) 10 Cal.5th 830, 842-843, 847-848 (*Gentile*); see *People v. Strong* (2022) 13 Cal.5th 698, 703, & fn 1.)  The legislation also provided a procedure (now codified in section 1172.6) for an individual convicted of felony murder or murder under a natural and probable consequences theory to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if he or she could not have been convicted of murder under Senate Bill 1437's changes to sections 188 and 189. (*Lewis*, at p. 959; *Gentile*, at p. 847.)

If the section 1172.6 petition contains all the required information, including a declaration by the petitioner that he or she is eligible for relief based on the requirements of subdivision (a), the court must appoint counsel to represent the petitioner upon his or her request pursuant to section 1172.6, subdivision (b)(3).  Further, upon the filing of a facially sufficient petition, the court must direct the prosecutor to file a response to the petition and permit the petitioner to file a reply, and the court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (See § 1172.6, subd. (c).)  Where a petitioner makes the requisite prima facie showing he or she falls within the provisions of section 1172.6 and is entitled to relief, the court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts. (§ 1172.6, subd. (d)(1).)  At that hearing the court may consider evidence "previously admitted at any prior hearing or trial that is admissible under current law," including witness testimony. (§ 1172.6, subd. (d)(3).)  The

13

petitioner and the prosecutor may also offer new or additional evidence. (*Ibid.*; see *Gentile, supra,* 10 Cal.5th at pp. 853-854.)

"At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. . . . A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3).)

On appeal from an order denying a petition under section 1172.6, we review the trial court's factual findings for substantial evidence. (*People v. Richardson* (2022) 79 Cal.App.5th 1085, 1090; *People v. Clements* (2022) 75 Cal.App.5th 276, 298.) We "'"examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt."' [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Clements*, at p. 298.)

14

B.       *Delgado Forfeited His Argument the Superior Court Should Have Reduced His Conviction to Second Degree Murder, and in Any Event Substantial Evidence Supports the Superior Court's Finding Delgado Was a Direct Aider and Abettor Who Acted with the Intent To Kill*

Delgado's sole contention on appeal is that the superior court failed to make a finding that Delgado personally harbored an intent to kill, and therefore he should be resentenced for second degree murder.  We agree with the People that Delgado forfeited this argument by failing to raise it at the evidentiary hearing.  Further, even had he not forfeited the claim, it lacks merit.

Delgado's only argument at the evidentiary hearing was that he was not the person who was driving the Jeep on the night of the shooting, nor was he in any way involved in the murder. The superior court rejected this argument, finding Rios's testimony to the contrary at the evidentiary hearing was not credible, nor was Elizabeth's alibi testimony believable.  Delgado has abandoned this argument on appeal and instead asserts the superior court never found Delgado had an intent to kill necessary for a conviction of first degree murder.  Delgado has therefore forfeited this argument. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1318 [failure to raise argument in trial court results in forfeiture on appeal]; *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court"].)[6]

---

[6]      Delgado argues in his reply brief that he did not forfeit this argument because a claim of insufficiency of the evidence is never

15

Even if Delgado had not forfeited this argument, he misconstrues the relief available under section 1172.6. Section 1172.6, subdivision (a), makes clear that it applies to "[a] person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime . . . ." The superior court found the prosecution proved beyond a reasonable doubt that Delgado was a direct aider and abettor in a planned attack against the Miraz family, not that Delgado was guilty of murder under a felony murder theory or the natural and probable consequences doctrine. Delgado does not argue otherwise, instead focusing on the degree of the offense. However, section 1172.6, subdivision (a), does not authorize the reduction of a conviction for first degree murder to one for second degree murder where the petitioner could still be convicted of murder under amendments to section 188 and 189, instead providing that a petitioner may request "to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts." And section 1172.6, subdivision (e), provides "[t]he petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes if the petitioner is entitled to relief pursuant to this section, murder or attempted murder was

_____

forfeited, citing *People v. Rodriguez* (2004) 122 Cal.App.4th 121, 129. However, Delgado's argument on appeal (other than a heading on page 8 of his opening brief), is not that substantial evidence did not support the court's findings, but that the superior court "did not articulate a finding Mr. Delgado had an express intent to kill . . . ."

16

charged generically, and the target offense was not charged." Here there is no target offense or underlying felony at issue.

Section 1172.6, subdivision (a)(3), underscores that the relief Delgado requests is not available for a section 1172.6 petition by specifying that a petitioner is only eligible for relief if, among other conditions, "[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." Delgado does not contend he could not be convicted of murder under current sections 188 and 189, instead limiting his argument to the degree of the offense. (See *Gentile, supra*, 10 Cal.5th at p. 848 ["Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought"].) Even if, as argued by Delgado in his reply brief, a reduction of Delgado's murder sentence from first degree to second degree murder were a "just result" (which the evidence does not support), that does not mean the statute provides for this type of relief. It does not.[7]

Further, contrary to Delgado's contention, the superior court found Delgado was an aider and abettor in a planned attack who acted with the intent to kill (first degree murder),[8]

---

[7]    To the extent Delgado contends he was wrongfully convicted of first degree murder, this argument would be more properly raised, if at all, in a petition for writ of habeas corpus.

[8]    "[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.'" (*Gentile, supra*, 10 Cal.5th at p. 843.) An "'aider and abettor's mental state must

17

explaining Delgado was an "aider and abettor in a planned attack with multiple weapons against the Meraz family and Meraz house resulting in death in that they went out there . . . with the intent to kill." The court elaborated that Delgado and others "case[d] the place," planned the attack earlier, and then returned with multiple weapons to "shoot up a house knowing that people are outside" and "did so with the intent to kill." Substantial evidence supports these findings. Richard testified at trial that on the afternoon of the shooting Delgado drove the Jeep with four or five passengers by the Meraz home, as one of the passengers inquired whether this was "'the house.'" Although Richard recanted in his 2012 declaration, he confirmed at the evidentiary

---

be at least that required of the direct perpetrator,' and when the crime is murder, the 'aider and abettor must know and share the murderous intent of the actual perpetrator.'" (*People v. Maciel* (2013) 57 Cal.4th 482, 518.) First or second degree murder requires proof of malice aforethought, which can be express (intent to kill) or implied ("proof that the actual perpetrator "'knows that his conduct endangers the life of another and . . . acts with conscious disregard for life'"). (*Gentile*, at p. 844.) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1.) "For implied malice, the intent requirement is satisfied by proof that the actual perpetrator "'knows that his conduct endangers the life of another and . . . acts with conscious disregard for life.'" [Citation.] Therefore, notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Gentile*, at p. 850.)

hearing that the Jeep was Delgado's and the driver on the night of the shooting "resembled" Delgado. And Richard admitted he had testified previously at trial Delgado was driving the Jeep on the afternoon of the shooting. Further, at trial Lopez identified Delgado as the driver of the Jeep that night, which again drove past the Meraz home with a group of men. The Jeep turned into an alley about three houses past the Meraz home, stopped, and two men exited the vehicle and walked toward the Meraz house. The two men and a third (never identified) shooter in the alley fired their weapons on the Meraz house, killing Mark. Although Rios testified at the evidentiary hearing that Delgado was not the driver of the Jeep that night or in any way involved in the murder, the superior court did not find Rios's testimony credible in light of Rios's earlier denials that he was involved in the murder and the fact Rios only admitted his culpability and sought to exonerate Delgado after Rios was paroled and no longer faced additional consequences from the murder. We defer to the superior court's credibility findings. (*People v. Brown* (2014) 59 Cal.4th 86, 106; *People v. Maury* (2003) 30 Cal.4th 342, 403.)

## DISPOSITION

The postjudgment order denying Delgado's petition for resentencing is affirmed.

FEUER, J.

We concur:

PERLUSS, P. J.          SEGAL, J.

19